UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ANCA ADAMS, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Civil Action No. 22-CV-11309-AK |
| AMERICA'S TEST KITCHEN, LP, AMERICA'S TEST KITCHEN, INC., and JACKIE FORD, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS'
MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE,
DISMISS THE COMPLAINT**

**A. KELLEY, D.J.**

Plaintiff Anca Adams ("Adams") brings this one-count putative class action on behalf of herself and all others similarly situated, alleging America's Test Kitchen, LP, America's Test Kitchen, Inc., and Jackie Ford (collectively, "Defendants") have violated the Video Privacy Protection Act, 18 U.S.C. § 2710, by sharing her video viewing activities with a third party. [See generally Dkt. 26]. Defendants have filed a motion to compel arbitration and dismiss the proceedings or, in the alternative, to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [Dkt. 31]. Adams opposes the motion. [Dkt. 36]. For the following reasons, Defendants' motion to compel arbitration or, in the alternative, dismiss the complaint [Dkt. 31] is **DENIED**.

1

I.      BACKGROUND

Because Defendants' motion to compel arbitration is made in connection with a motion to dismiss or stay, the Court draws the relevant facts from the operative complaint [Dkt. 26] and the documents submitted to the Court in support of the motion to compel arbitration [Dkt. 31; Dkt. 32; Dkt. 33; Dkt. 34] unless otherwise noted.  See Cullinane v. Uber Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018).  The Court recites here only those facts necessary to understand what has led to this action.  Further details relevant to the Court's analysis will be discussed as needed.

Defendants operate a website, www.americastestkitchen.com, which offers a variety of video content related to cooking.  [Dkt. 26 at ¶ 20].  Consumers may subscribe to view the website's content by providing their name, email, billing address, and credit or debit card information.  [Id. at ¶ 22].  Adams has been a paying subscriber since 2016.  [Id. at ¶ 40].  To become a subscriber, a user must register, which is a two-step process.  [See Dkt. 34 at ¶¶ 10-12].  On the first screen, the user must provide an email address, first and last name, and a password, and then must click a red button marked "CONTINUE."  [Id. at ¶ 11; see Dkt. 34-1 at 2].  The user is then taken to a second page, where the user must provide a billing address and credit card information.  [Dkt. 34 at ¶ 11].  Immediately beneath the boxes for the user to enter the requested information is a large red button labeled "START FREE TRIAL."  [Id.; see Dkt. 34-2 at 2].  Beneath the "START FREE TRIAL" button are at least six paragraphs of text in small font.  [See Dkt. 34-2 at 2].  The third paragraph begins with the word "**TERMS**" in bold, capitalized letters, which is followed by an instruction: "You may cancel your Membership at any time, including cancellation of any automatic renewal.  If you cancel your automatic renewal selection, your current Membership will continue until completion."  [Id.].  Two paragraphs below that, users are notified that their "participation in this membership is subject to our

corporate terms and conditions which can be found here." [Id.]. The word "here" is in red, while the rest of the paragraphs are in black, and "here" is a hyperlink that directs users to the Defendants' terms and conditions of service. [See id.; Dkt. 34 at ¶ 12]. Those terms include an arbitration provision that provides that "[a]ll claims and disputes . . . shall be resolved by binding arbitration on an individual basis under the terms of this Arbitration Agreement." [Dkt. 33-1 at 7-10].

At some point, Defendants installed "Pixel" on the website, which shares information about consumers' activities with Meta Platforms, Inc., formerly known as Facebook, Inc. ("Facebook"). [Dkt. 26 at 1, ¶ 4]. Pixel allows businesses to "collect information about how users interact with the business's website," including purchases made, items viewed, and content requested. [Id. at ¶ 24]. In essence, it allows the website to track consumers' actions and report those actions to Facebook. [Id. at ¶ 25]. Here, Pixel shares the consumer's Facebook ID ("FID"), which is a unique sequence of numbers linked to that user's Facebook profile, and the title and URL of any video the consumer views on Defendants' website with Facebook. [Id. at ¶¶ 6, 23, 29, 43].

Adams filed this one-count putative class action in state court on behalf of herself and others similarly situated for violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, alleging that Defendants' use of Pixel disclosed to a third party "personally identifiable information" about the videos Adams and similarly situated subscribers requested or obtained from Defendants' website without their written consent. [Id. at ¶ 1, 3-4, 55-66]. Adams also claims that such disclosure was made knowingly. [E.g., id. at ¶ 63]. Defendants removed the suit to the District of Massachusetts. [Dkt. 1]. After Adams filed an amended complaint, Defendants filed the present motion to compel arbitration and dismiss the proceedings or, in the

alternative, to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). [Dkt. 31]. Plaintiff opposes the motion. [Dkt. 36]. The Court heard oral argument on June 12, 2023. [See Dkt. 41; Dkt. 42].

## II.     DISCUSSION

Defendants first argue that Adams agreed to arbitrate her claims on an individualized basis, and the Court must enforce that agreement pursuant to the Federal Arbitration Act. [Dkt. 32 at 11-18]. Adams counters that the arbitration agreement is neither valid nor enforceable. [Dkt. 36 at 4-15]. Defendants next contend that Adams has failed to allege a "concrete injury" and therefore has not established constitutional standing to bring a suit in federal court. [Dkt. 32 at 18-22]. Adams responds that the complaint alleges facts sufficient to demonstrate a concrete injury. [Dkt. 36 at 15-20]. Finally, Defendants claim that the action must be dismissed because the complaint does not adequately allege the elements of a VPPA claim. [Dkt. 32 at 22-29]. Adams replies that the well-pleaded allegations in the complaint are sufficient to survive a motion to dismiss. [Dkt. 36 at 20-29].

### A.     Enforceability of the Arbitration Provision

The Federal Arbitration Act ("FAA") provides that a "written provision" in a "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. It established a "liberal federal policy favoring arbitration," requiring courts to "place arbitration agreements on an equal footing with other contracts" and "enforce them according to their terms." Cunningham v. Lyft, Inc., 17 F.4th 244, 249 (1st Cir. 2021) (citing AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011)). The party seeking to compel arbitration must show

4

that (1) a valid agreement to arbitrate exists; (2) the movant is entitled to invoke the arbitration clause; (3) the other party is bound by that clause; and (4) the claims asserted come within the clause's scope.  Ouadani v. TF Final Mile LLC, 876 F.3d 31, 36 (1st Cir. 2017) (citation omitted).

Defendants argue that Adams agreed to arbitration when she subscribed to the Defendants' website, as there is an arbitration clause in the website's terms and conditions that governs the claim at issue.  [Dkt. 32 at 11-18].  Adams counters that Defendants have not established that she entered a contract with an arbitration clause, that such contract is not enforceable, and that her claim does not fall within the arbitration clause.[1]  [Dkt. 36 at 4-15].  The FAA "does not require parties to arbitrate when they have not agreed to do so," and the first step in deciding a motion to compel arbitration is to determine whether a "written agreement to arbitrate" exists.  Cullinane, 893 F.3d at 60 (citations omitted).  In other words, the threshold question is whether the parties entered into a valid agreement to arbitrate.

Arbitration is a "matter of contract," and courts generally apply "state-law principles that govern the formation of contract."  Id. at 61 (citation omitted).  There is no dispute that Massachusetts law applies here and that the contact at issue was formed online.  The "fundamentals of online contract formation should not be different from ordinary contract

---

[1] Adams briefly argues that Defendants failed to put forth specific evidence regarding Adams' registration process and the terms and conditions in effect in 2016 when Plaintiff subscribed to the website. [Dkt. 36 at 4-6]. In particular, Adams notes that Defendants focus on their "present-day registration process" and on terms and conditions that were updated in 2019, three years after Adams subscribed to the Defendants' website. [Id. at 6]. In their motion, Defendants note that "[a]ll subscribers . . . including Ms. Adams" necessarily agree to the terms and conditions when they complete the registration process, and they provide evidence of that process. [Dkt. 32 at 7-9; see Dkt. 34 at ¶¶ 11-12]. Thus, the question is whether the registration process provides sufficient notice of the terms and conditions. Moreover, in their reply to Adams' opposition, Defendants explain that Adams canceled her membership and re-registered as a subscriber in 2019, when the registration screen was "materially identical to the process that exists today," and the terms and conditions were "essentially identical" to those in effect today. [Dkt. 38 at 3-4]. Defendants also provide evidence in support of that statement. [Dkt. 39 at ¶¶ 6-9]. As such, this argument does not affect the Court's analysis of the issues, in particular, whether there was reasonable notice of the terms and conditions such that the parties' contract is enforceable here. See Kauders v. Uber Techs., Inc., 159 N.E.3d 1033, 1048-49 (Mass. 2021) (citations omitted).

5

formation," and an online contract is enforceable when the "contract provisions at issue" are "reasonably communicated and accepted." Kauders v. Uber Techs., Inc., 159 N.E.3d 1033, 1048 (Mass. 2021) (citations omitted). That is, "there must be both reasonable notice of the terms and a reasonable manifestation of assent to those terms" for the contract to be enforceable. Id. at 1049.

Notice may be actual or constructive. Small Justice LLC v. Xcentric Ventures LLC, 99 F. Supp. 3d 190, 196 (D. Mass. 2015). "Actual notice will exist where the user has reviewed the terms" and will "generally be found where the user must somehow interact with the terms before agreeing to them." Kauders, 159 N.E.3d at 1049. Such is not the case here. The Court therefore must determine whether "reasonable notice has been given of the terms and conditions," which is a "fact-intensive inquiry" requiring the Court to evaluate "the totality of the circumstances." Id. (citations omitted). "In determining whether the notice is reasonable, the court should [] consider the nature, including the size, of the transaction, whether the notice conveys the full scope of the terms and conditions, and the interface by which the terms are being communicated." Id. at 1049-50. When the "terms of the agreement are only available by following a link," as is the case here, "the court must examine 'the language that was used to notify users that the terms of their arrangement . . . could be found by following the link, how prominently displayed the link was, and any other information that would bear on the reasonableness of communicating'" the terms of the agreement. Cullinane, 893 F.3d at 62 (citing Ajemian v. Yahoo!, Inc., 987 N.E.2d 604, 612 (Mass. App. Ct. 2013)). Courts look generally to the "conspicuousness and placement" of the link to the terms and conditions, in addition to "other notices given to users of the terms of use" and the general design of the website. Small Justice, 99 F. Supp. 3d at 196; see Kauders, 159 N.E.3d at 1050 ("For Internet

transactions, the specifics and subtleties of the 'design and content of the relevant interface' are especially relevant in evaluating whether reasonable notice has been provided." (citation omitted)); see also Cullinane, 893 F.3d at 62 ("[C]larity and conspicuousness are a function of the design and content of the relevant interface." (citation omitted)).

After completing the first step of the two-step registration process, Adams was presented with the "START FREE TRIAL" screen, where a user must provide billing information, including credit card details. [Dkt. 34 at ¶¶ 11-12]. That screen looks like this, though the parties disagree as to how much of the text is visible on a computer screen without scrolling:



[Dkt. 34-2; see Dkt. 36 at 9; Dkt. 38 at 4].

On Defendants' website, the request for the submission of billing information comes first, and it is in large, bold text. [See Dkt. 34-2]. Users are prompted to enter an address in the top

7

set of boxes and credit card information in the bottom set of boxes.  [Id.].  Between those two entry fields, the phrase, "**SAVE 40% ON DIGITAL ALL ACCESS**," appears in capitalized, bold font, and users may select a button to subscribe to Defendants' "multi-site membership." [Id.].  Underneath all of that is a large, red button with the capitalized phrase "START FREE TRIAL" in contrasting white font inset in the box.  [Id.].  Below that red button are at least six paragraphs of text in smaller, lighter font than the font used for the request for billing information and multi-site membership advertisement that appear above.  [Id.].  Of those six paragraphs, the first two are the longest, and neither mentions any terms or conditions.  The third paragraph begins with "**TERMS**" in bold, capitalized font, followed immediately by the text: "You may cancel your Membership at any time, including cancellation of any automatic renewal.  If you cancel your automatic renewal selection, your current Membership will continue until completion."  [Id.].  It is not until two paragraphs below the word "**TERMS**" that Defendants' terms and conditions are mentioned.  In that paragraph, which is the fifth paragraph overall, is the phrase: "Your participation in this membership is subject to our corporate terms and conditions which can be found here."  [Id.].  The word "here," which is in red font, is a hyperlink to Defendants' terms and conditions, which include the arbitration provision at issue.

      The website fails to provide "reasonable notice of the terms," and therefore a "contract [has not] been formed here," for a number of reasons.  Kauders, 159 N.E.3d at 1054.  As an initial matter, the link to Defendants' terms and conditions is not, as was the case in at least one action where the court found that notice of the website's terms and conditions was sufficient, "immediately adjacent to the [red] button" to "START FREE TRIAL" and become a subscriber—it is *five* paragraphs below that and *two* paragraphs below the appearance of the word "**TERMS**."  See In re Daily Fantasy Sports Litig., No. MDL 16-02677-GAO, 2019 WL

6337762 (D. Mass. Nov. 27, 2019), at *10 (finding that "[a]ny reasonable viewer . . . would necessarily notice" the website's terms and conditions when registering where "two lines below the 'Play Now' button, in a four-line block of text, the site displayed the notice 'Joining confirms you're 18+ years of age and that you agree to our **Terms of Service**'"); see also Small Justice, 99 F. Supp. 3d at 196 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the [] agreement." (citation omitted)).  Such placement is not "conspicuous."  See Cullinane, 893 F.3d at 62.  Instead, "the top of the screen [is] where the user [is] required to focus and fill in information," and the "purpose of the screen, as indicated by the title at the top, [is] for the user to enter payment information."  Kauders, 159 N.E.3d at 1053.  Little about the screen "conveyed to a user that he or she should open a link that would reveal an extensive set of terms and conditions at the bottom of the screen to which the user was agreeing." Id.  Indeed, a user "could complete the ["START FREE TRIAL"] screen and the account creation process without ever focusing on the link or the notice on the screen" of the terms and conditions.  Id.

Another factor that weighs in favor of finding that notice of the terms and conditions is insufficient is the "characteristics of the text used to notify potential users" of the terms and conditions.  Cullinane, 893 F.3d at 64.  "Several nonexhaustive examples of general characteristics that make a term conspicuous include using larger and contrasting font, the use of headings in capitals, or somehow setting off the term from the surrounding text by the use of symbols or other marks."  Id. at 62.  None of these approaches is used to set apart the terms and conditions on Defendants' website.  The phrase, "Your participation in this membership is subject to our corporate terms and conditions which can be found here," appears in a font that is

lighter and significantly smaller than the font instructing users to submit billing information. Moreover, that statement, including the link to the terms and conditions, is separated from the bolded, capitalized "**TERMS**" heading by several lines of text, thus diminishing any effect such heading would have on drawing a user's attention to the terms and conditions. The use of contrasting, red font for the word "here," which also serves as a link to the terms and conditions, cannot overcome these inadequacies. Indeed, it suffers from its own failings, as it "[does] not have the common appearance of a hyperlink," which is "commonly blue and underlined," nor does the word "here"—which is the only part of the phrase in contrasting font—on its own suggest that it links to extensive terms and conditions binding on all subscribers. Id. at 63. There is no "distinguishable feature" to draw the user's attention to the terms and conditions, and the red "here" hyperlink and bolded, capitalized "**TERMS**" two paragraphs above do little to "set [the terms and conditions] apart from all the other terms surrounding it." Id. at 64.

Simply put, the design of Defendants' website "enables, if not encourages, users to ignore the terms and conditions." Kauders, 159 N.E. 3d at 1053. The headings on the screen, as well as much of the information on the screen, focus on payment information, not the terms and conditions, and the user's attention is directed at the red "START FREE TRIAL" box. Moreover, the majority of other text on the screen "appear[s] as prominently as" the reference to the terms and conditions, "if not more so." Id.; see Cullinane, 893 F.3d at 63-64 ("Even though the hyperlink did possess some of the characteristics that make a term conspicuous, the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention. If everything on the screen is written with conspicuous features, then nothing is conspicuous."). The notice of the terms and conditions of Defendants' website is not conspicuous and, based on

the totality of the circumstances, is not reasonable. Defendants have failed to carry their burden on their motion to compel arbitration.

**B.     Standing**

In the alternative, Defendants move to dismiss Adams' claim pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that Adams has failed to allege she suffered a "concrete injury" as required by the United States Constitution. [Dkt. 32 at 18]. Adams counters that she has sufficiently claimed that Defendants' "practice of knowingly disclosing her [personally identifiable information] about the videos she requests or obtains from [Defendants'] [w]ebsite to Facebook violated her privacy rights, and specifically the VPPA." [Dkt. 36 at 16-17].

To establish Article III standing, a plaintiff must establish she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (citations omitted); see U.S. Const. art. III. Defendants challenge the first element. Adams alleges Defendants have violated her privacy rights under the VPPA by disclosing her FID, which is a "unique sequence of numbers" that "identifies an individual's Facebook account," and the "video content name" and "its URL" though their use of Pixel while she was a website subscriber, which violated her "statutorily protected right to privacy." [Dkt. 26 at ¶¶ 5-6, 23, 29, 33, 40-44, 64]. Such allegations are sufficient to establish an injury in fact. See Yershov v. Gannett Satellite Info. Network, Inc., 204 F. Supp. 3d 353, 361 (D. Mass. 2016) (noting that courts have found that "consumers alleging that a video tape service provider knowingly disclosed their [personally identifiable information] to a third party without their consent have satisfied the concreteness requirement for Article III standing," as the VPPA "elevated an

otherwise non-actionable invasion of privacy into a concrete, legally cognizable injury") (collecting cases).

Defendants argue that <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190 (2021), requires plaintiffs to allege "more than the existence of a risk of future harm or statutory violation (even if the statute includes a private right of action)," and Adams has failed to establish a "concrete injury"—instead alleging a mere statutory violation—under that Supreme Court decision. [Dkt. 32 at 19]. Even if the Court assumes Defendants' reading of <u>TransUnion</u> is correct, Adams has alleged facts sufficient to state a concrete harm under Article III. She does not allege that Defendants may, at some point in the future, send her personally identifiable information to a third party; she alleges that they already have disclosed such information. [<u>See</u> Dkt. 26 at ¶ 43]. Further, the class on whose behalf she brings this action is "[a]ll persons . . . who subscribed to Defendants' America's Test Kitchen website, requested or obtained video content on a website operated by Defendants, and used Facebook during the time Facebook's Pixel was active on Defendants' website." [<u>Id.</u> at ¶ 45]. Her focus is clearly on *past* harm and users whose personally identifiable information was, in fact, sent to a third party; it is not a mere "risk of future harm" or simple "statutory violation," as argued by Defendants, and the complaint adequately alleges that Adams and the proposed class members "have been *concretely harmed* by a defendant's statutory violation." <u>TransUnion</u>, 141 S. Ct. at 2205, 2211 (emphasis in original) (finding that standing did not exist because the "plaintiffs did not demonstrate that the risk of future harm materialized"); <u>see also</u> <u>Yershov</u>, 204 F. Supp. 3d at 362 ("The intangible

harm allegedly suffered by [the plaintiff] from [the defendant's] alleged disclosure of his [personally identifiable information] is a concrete injury in fact.").

Defendants also argue that the information disclosed to Facebook is not "personally identifiable information" as defined by the VPPA, and thus there is no injury in fact that confers standing. [See Dkt. 32 at 20-22]. Specifically, Defendants explain that "there is no violation of the law unless a person's [personally identifiable information] is linked to the titles of specific video materials that they 'requested or obtained,'" which is not the case here. [Id. at 22]. Adams responds that such an assertion is an "attempt[] to couch a direct attack on the merits of Plaintiff's claim as a jurisdictional attack," which is improper. [Dkt. 36 at 19]. The Court agrees with Adams. See Martin v. Meredith Corp., -- F. Supp. 3d --, No. 22-CV-04776 (DLC), 2023 WL 2118074, at *2 (S.D.N.Y. Feb. 17, 2023) ("The defendants argue that the plaintiff's alleged injury is not an injury in fact because the information disclosed to Facebook does not include information protected by the VPPA. But whether the precise disclosure is actionable under the VPPA is a question about the merits of [the plaintiff's] claim, rather than his ability to bring his case in federal court."). However, even if the Court assumes Defendants' argument is properly brought as a jurisdictional issue, Defendants do not prevail here.

The VPPA prohibits disclosure of personally identifiable information, which "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). To establish standing, Adams need only allege that Defendants disclosed information to a third party that "identifies [Adams] as having requested or obtained specific video materials or services." See Yershov, 204 F. Supp. 3d at 363. It is "at least a plausible allegation" that Facebook could identify Adams by

13

using only the information disclosed by Defendants' website, especially "in combination with other easily obtainable, publicly available information." Id. at 364.

Defendants acknowledge that Pixel shares "the 'URL' or web address of which webpages a given user has visited and the FID of the website visitor." [Dkt. 32 at 21; see Dkt. 34 at ¶ 17]. Adams alleges that anyone can "specifically identify" the individual behind the FID—and therefore the person requesting or obtaining a particular video on Defendants' website—by entering the FID into a web browser. [Dkt. 26 at ¶ 37]. As such, the FID "effectively reveal[s] the name of the video viewer."[2] Yershov v. Gannett Satellite Info. Network, Inc., 820 F.3d 482, 486 (1st Cir. 2016). Still, Defendants argue that the video title is not sent, and therefore the information shared by Pixel cannot be considered personally identifiable information. [Dkt. 32 at 21]. However, in the example provided in the complaint, the title of the video appears in the URL. [Dkt. 26 at ¶ 36]. Moreover, a simple visit to the URL would provide any third party who receives the information confirmation of the specific video requested or obtained. Taken together, at this stage, the web address provides information sufficient to surmise the name of the video, and the FID similarly provides information sufficient to surmise the identity of the user. See Yershov, 820 F.3d at 486 (explaining that the language of the VPPA "reasonably conveys" that personally identifiable information "is not limited to information that explicitly names a

---

[2] Defendants compare this case to Yershov v. Gannett Satellite Info. Network, Inc., 820 F.3d 482 (1st Cir. 2016), 204 F. Supp. 3d 353 (D. Mass. 2016), in which GPS coordinates were disclosed alongside a "random numeric identifier" of a mobile device, arguing that the FID here is insufficient to enable identification in violation of the VPPA. [Dkt. 32 at 20-21]. Contrary to Defendants' assertions, it is not clear to this Court that the sharing of GPS coordinates was the decisive factor in that case. [See Dkt. 32 at 20-21, 23-25]. Moreover, the numeric identifier in that case was fundamentally different than the FID at issue here. See, e.g., In re Hulu Priv. Litig., No. C 11-03764 LB, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("More to the point, a Facebook user—even one using a nickname—generally is an identified person on a social network platform. The Facebook User ID is more than a unique, anonymous identifier. It personally identifies a Facebook user. That it is a string of numbers and letters does not alter the conclusion."). Indeed, Adams alleges that anyone can easily obtain an individual's profile by entering the FID in a web browser. [See Dkt. 26 at ¶ 37]. Such was not the case with the numeric identifier for the mobile device in Yershov, and therefore information like GPS coordinates affected "the linkage of information to identity" differently. Yershov, 820 F.3d at 486.

14

person"). The fact that Pixel does not track whether a user plays, pauses, or otherwise interacts with the video is irrelevant to the alleged privacy violation, as the information disclosed enables third parties to "connect[] a certain user to certain videos." In re Hulu Priv. Litig., 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015). Indeed, Defendants acknowledge that Pixel "may, therefore, transmit information that could be used to identify an individual (in conjunction with other information[])." [Dkt. 32 at 21]. Adams therefore adequately alleges that Defendants "disclosed information reasonably and foreseeably likely to reveal which [] videos [Adams] has obtained," which is sufficient to establish standing. Yershov, 820 F.3d at 486.

### C. Allegations of a VPPA Violation

Defendants' final attempt to dispose of Adams' claim is to argue that the complaint fails to state an actionable violation of the VPPA, and it must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). [Dkt. 32 at 22-29]. Specifically, Defendants claim that the complaint fails to plead that (1) the information disclosed constitutes personally identifiable information; (2) the Defendants "knowingly disclosed" the alleged personally identifiable information to a third party; and (3) the alleged disclosure was done without Adams' consent. [Id.]. Adams refutes each of these contentions. [See Dkt. 36 at 20-29].

To allege a violation of the VPPA, a plaintiff must plead sufficient facts suggesting that a "video tape service provider knowingly disclosed, to any person, personally identifiable information concerning any consumer of such provider." Ambrose v. Bos. Globe Media Partners, No. CV 21-10810-RGS, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (citation and internal modifications omitted). Because this issue is raised in a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court "accept[s] as true all the factual allegations in the complaint and construe[s] all reasonable inferences in favor of the plaintiff[],"

15

Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (citation omitted), limiting its review to "the complaint, documents attached to it, and documents expressly incorporated into it," Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 72 (1st Cir. 2014).

      The Court has already discussed whether the complaint adequately alleges that the disclosed information constitutes personally identifiable information. As to whether Defendants "knowingly disclosed" Adams' personally identifiable information, Adams alleges that Defendants "chose to install" Pixel, a "unique string of code businesses can embed on their website[s] allowing them to track consumers' actions and report the actions back to Facebook," on their website, "thus making the knowing choice to track subscribers' [personally identifiable information] and send it to Facebook." [Dkt. 26 at ¶¶ 4, 21, 25]. Adams further alleges that Defendants programmed Pixel on its website "[t]o take advantage of advertising and information services offered by Facebook" and "knowingly disclos[ed] subscribers' FIDs, together with the content they request or obtain, to Facebook." [Id. at ¶¶ 28, 39]. Adams asserts that "[a]t all relevant times, Defendants knew that the Facebook Pixel disclosed [personally identifiable information] to Facebook," as evidenced by the "functionality of the Pixel, including that the Pixels' sharing of information with Facebook enabled Defendants' website to show targeted advertising to its digital subscribers based on the content those digital subscribers had requested or obtained on the website, including videos." [Id. at ¶ 32]. These allegations are sufficient to raise a plausible claim that Defendants "actually knew that [they were] disclosing: 1) a user's identity; 2) the identity of the video material; and 3) the connection between the two," and that Facebook "might 'read'" the user data and video content "together." In re Hulu Priv. Litig., 86 F. Supp. 3d at 1097. Contrary to Defendants' assertions, it does not matter, at least at this stage,

whether they knew that each individual user had a Facebook account, nor whether Facebook, in fact, linked such information to particular accounts.[3]  [See Dkt. 32 at 27-28].

The VPPA allows the disclosure of personally identifiable information with a consumer's "informed, written consent (including through an electronic means using the Internet)" if it satisfies certain requirements.  18 U.S.C. § 2710(b)(2)(B).  Consent is generally an affirmative defense and may be considered on a motion to dismiss only when "the facts establishing the defense are clear from the face of the complaint as supplemented by 'matters fairly incorporated within it and matters susceptible to judicial notice.'"  Monsarrat v. Newman, 28 F.4th 314, 318 (1st Cir. 2022) (citation omitted).  Defendants rely on their Privacy Policy to argue that Adams consented to disclosure, stating that it is properly before the Court because it "is incorporated into the Complaint by repeated, detailed reference to [Defendants'] privacy policies."  [Dkt. 32 at 9 n.4; see Dkt. 32 at 28-29].  However, a close reading of the complaint reveals no reference to Defendants' privacy policies.  Therefore, the Privacy Policy is not properly before the Court, and Defendants' argument regarding consent fails at this stage.  See Schuster v. Harbor, 471 F. Supp. 3d 411, 416 (D. Mass. 2020) (noting that a court may only "take into consideration the existence and contents" of narrowly accepted documents and "will not assume the truth of the findings asserted therein").

> Even if the Court did consider the Privacy Policy, Adams alleges that
>
> Defendants never obtained from Plaintiff or any [c]lass member informed, written consent in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; Defendants never obtained from Plaintiff or any Class member informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to

---

[3] Adams also alleges the FID and URL were sent together to Facebook, which undermines Defendants' argument that there was not a "knowing disclosure."  See In re Hulu Priv. Litig., 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015) (noting that the "user's identity and that of the video material were transmitted *separately* (albeit simultaneously)," and therefore plaintiffs had not established knowing disclosure of personally identifiable information (emphasis added)).

exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendants never provided an opportunity, in a clear and conspicuous manner, for Plaintiff or any [c]lass member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election.

[Dkt. 26 at ¶ 62].  This allegation undermines Defendants' claim that Adams gave consent to disclose her personally identifiable information, and there remain factual issues to resolve. Dismissal on this basis would be inappropriate at this stage.[4]

### III.  CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration or, in the alternative, dismiss the complaint [Dkt. 31] is **DENIED**.

**SO ORDERED.**

Dated: June 30, 2023                                                /s/ Angel Kelley
                                                                    Hon. Angel Kelley
                                                                    United States District Judge

---

[4] Defendants also argue that America's Test Kitchen, Inc., and Jackie Ford are not "video tape service providers" and should be dismissed.  [Dkt. 32 at 29-30].  Defendants state that the two are not "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials," but provide no case law to support that statement.  [Id. at 30 (quoting 18 U.S.C. § 2710(a)(4))].  Defendants also contend that the complaint "makes no attempt to differentiate the Defendants," and that "the absence of allegations that would render them plausible defendants in a VPPA action" makes dismissal appropriate.  [Dkt. 32 at 30].  Adams alleges that America's Test Kitchen, Inc., is a registered general partner of America's Test Kitchen, LP, and is authorized to sue and be sued on behalf of American's Test Kitchen, LP, and that Jackie Ford is a general partner of America's Test Kitchen, LP.  [Dkt. 26 at ¶¶ 11-12].  Adams also alleges that all of the Defendants are "video tape service providers."  [Id. at ¶ 57].  Without more, Defendants' arguments here are not sufficient to dismiss America's Test Kitchen, Inc., and Jackie Ford at this stage.  If there is, in fact, no legal basis to include them as defendants in this action, the Court encourages the parties to resolve the issue independently.